Cobbs and Jelks. All right, we've got Mr. Cook here for the appellant and Mr. Taylor here for the appellees. Very well, Mr. Cook, whenever you're ready. Thank you, Your Honor, and may it please the Court. I know that you've all read the briefs and you know that Mr. Dombrowski was stirring 80 gallons of oatmeal on a hot kitchen and a wet, slippery floor when he . . . When he was lying down, how many . . . Just the kitchens. . . . any personnel of the prison were anywhere around? I'm just guessing that it was around six or seven people. Beg pardon? I say I'm just guessing, but I believe it's about six or seven people were in the kitchen itself. Yeah, while he was lying there in pain. Yes, he was moved at some point to the dining hall. They were doing count and they wanted him to be there for count, so he was lifted by two inmates. That's where he was when the officer who intervened audibly found him. That's my understanding, Your Honor. Is the record clear, I thought the record was clear, that when he was crying, he says he was asked who was there and he says a couple of inmates, but not Cobbs and Jelks, right? I believe that's correct, Your Honor. I think this is a dynamic situation, but he was placed on a low bench by two inmates. When he first saw Officer Jelks, he asked her to make a report to medical to come and help. The reason I ask is that if we're talking about the officer's subjective appreciation of this substantial risk of serious harm, when he talked to Jelks, asked for help, she said, I'll get it, and then he asked again and she said, it's coming. I think he also told Jelks, right, that it might not be that big of a deal, maybe I can just pop it back in, and then for the crying episode, which comes later, I don't think Jelks and Cobbs were there. All of this matters to their subjective perception, appreciation of the substantial risk of serious harm. I think that Mr. Dombrowski said that Jelks and Cobbs would come and go and make unsympathetic comments as he was laying there. He said at first he thought that it was just a displaced socket, but he said that as time went on, over a period of 30 minutes, the pain got worse and worse until he really couldn't stand it anymore, and he kept asking when they were coming, and as far as he knows, no further effort was made. Were Jelks and Cobbs present in the kitchen dining area the whole time until he was taken away at some point? I understand they were all there during the five hours, but that only a couple of inmates helped him. We feel... Isn't the evidence undisputed that the second time when they, he said, when your client asked for when's medical coming, Jelks told him, and he gave him an explanation for why medical had not been there, that they were attending to COVID checks throughout the prison and would be there afterwards. They were doing temperature checks, they were checking asymptomatic people. We don't know, and I think the jury could infer that either Jelks didn't make the report or that she didn't report it accurately, because according to triage principles, they would have been there, and when later that day, when someone saw a sergeant passing by, they told him about what had happened, and he got... There's no contrary evidence in the record, though. I mean, that's an undisputed fact that Jelks did tell your client that the reason that medical was not there was because of this other issue. We agree that she said that, but we think that there was... Jury could also take an inference based on the fact that in order to document that with medical, they would have had to admit that they hadn't provided him with the non-slip safety boots, which were absolutely mandatory for work in the kitchen. And so we think a jury could infer that no report was made or a truthful report was not made. Didn't your client specifically state in his grievance that a report was made for medical by Jelks? I don't think so. I think he may have said that Jelks told him that she had made a report. Go ahead, Counselor. Yes, thanks. So there were a number of reasons... Sorry. So I'm looking at docket entry 87-6, page 1. This is your client's grievance, that's the informal grievance. In the request part, the narrative part, it states, on September 13, 2020, after falling in kitchen and breaking right hip, Officer Jelks called medical for a wheelchair medical emergency at about 4.30 a.m. Medical did not arrive until 10 a.m. after an inmate yelled out, the dining hall for Sergeant Morgan, et cetera, et cetera. That's not Jelks told me, that is Jelks called, and it's a specific time and a specific call out for what was done, right? But I think he accepts that based on what she told him. But that doesn't say, that doesn't say Jelks told me, it says that Jelks called. So how do we not accept, this is your client's written statement, signed under oath. How do we not accept that as what the facts, in fact, are? She may, I'm not saying that she didn't tell them, I'm saying that she may not have, or she may not have truthfully stated what the situation was. Let me talk about the boots. So I understand that the policy was what the policy was. And certainly if we were here on a violation of policy, there's no doubt that someone would be responsible for it, but that's not what we're here for. We're here for whether the officers knew there was a serious and substantial risk of harm to your client, that is slipping, falling, and breaking a hip, from the failure to have boots. Is there any evidence in the record of a prior incident that resulted in a hip breaking or some other broken bone? We don't have specific information about prior injuries. We only know that there were prior slip and falls.  And so, I mean, slipping and falling, while, you know, not great, is certainly not an objectively serious harm that the Eighth Amendment is involved in. For example, your client slipped and fell in December of the prior year, I think it's December of 2019, and it appears to have been bruised, took some Tylenol, and was back at work the next day, right? A slip and fall on a hard surface is a potentially dangerous situation. And I think in McGillicott, the appellants, the appellees were found deliberately indifferent for failure to take the additional step, although the injury was not visible. It was something that was serious enough that... I know, but the question we're talking about is the subjective element to it. So what subjectively would have put the officers on notice that the failure to have the boots would result in as serious of an injury or a constitutionally serious injury like your client suffered on this particular day? Well, the knowledge that the mandatory rule existed, that it was reiterated by the assistant warden that no one was supposed to be working in the kitchen without the safety boots. Yeah, that's certainly true. And your client actually makes a good point in his deposition about why that's the case. And that's because the Crocs have little... I'm not a big Crocs fan, but they have little holes on them at the top. I know some people put little devices in those holes, but generally they're open little holes. And you might wear wearing socks with them, but they have the holes in them. And as I think you point out, there's all these hot liquids and hot liquids don't go well with open-toed, open shoes. That's why you wear closed shoes, right? Right. And slippery soles rather than non-slippery. Well, so that's a different aspect to it. If this was a burn case, maybe there'd be a closer part, but I think you might still need prior incidents. But given that the reason for the closed-toed shoes, the sort of the solid shoes and not Crocs is for burning, and this is not a burning case, how are we supposed to know, are they on notice that this kind of thing is supposed to happen? They knew it to the point of criminal recklessness. Well, first of all, because they threatened him with loss of all his gain time if he didn't agree to work in dangerous conditions without the boots. And secondly, because the chief feature of the boots is their non-skid surface for this particular use. So we feel that as in Gilbert versus Lee County, this is a situation where they themselves contributed to the... Counsel, in Gilbert, the pregnant inmate was leaking amniotic fluid for days without anybody doing anything. What we said there that it was obvious to anybody that she was in pain and suffering despite that. In other words, it was days of incidents. We don't have anything other than that I can tell on the record from September 13th of 2020 that someone is likely to slip and fall and injure themselves to this extent. The cases are legion that any sustained pain that is unreasonably ignored can be a violation of the Eighth Amendment. Jumping back and forth between the two claims here, I mean, to the extent you want to talk about pain unreasonably endured, that seems to me to be about his time on the table, what Elks knew, who saw him crying, but I don't really think that's responsive to Judge Luck's question about the front end piece about the slip in the first place, right? Yeah, it doesn't address it head on, but I think that our position is that the fact of their sustained refusal to give him boots day after day in dangerous situation creates the kind of contribution that turns this from a negligent slip and fall into the kind of subjective recklessness that we see in Wade versus McDade and Farmer versus Brennan. So we think that that's fundamental. Their contribution to the harm is fundamental to the injury and creates deliberate indifference. There was no discretion not to issue those boots. The rules existed for a reason, they all knew that, and it wasn't just him that they denied boots. It was Cobb in her discovery said it wasn't normal to give them to anybody. Okay, very well. All right, so you've got three minutes of rebuttal time remaining. Yeah, please. One question. Mr. Cook, does the record tell us what the inmate population was here? Yes, it was 1,400 inmates that... What was the design for the facility? Well, it was... They're designed for... The normal one is a 500-bed facility. Was it overcrowded? I don't know. That seems large for an annex, but I don't know if it was overcrowded. That's all right. Okay, very well. Mr. Taylor, let's hear from you. Good morning, Your Honor. Good morning. I'm Mark Taylor on behalf of the appellees, Cobbs, Jelks, and Wilson. Your Honor, this case essentially is about a slip and fall and the measures taken during COVID-19 in order to take care of the situation. The first issue is that Mr. Dombrowski wearing these resin shoes in the food service areas and whether he was forced to, whether it amounts to cruel and unusual punishment under the Amendment, and quite frankly, just does not arise to cruel and unusual punishment. Regardless of the policy that says boots are to be worn, the courts have held that the policy aside, not every deviation from such ideal safety conditions amounts to a constitutional violation. You agree though that the officers here were aware of prior slip and fall incidents, correct? They're aware that there had been slip and falls, but in those cases, there have been no injuries. Certainly no injuries. Does that matter for serious or substantial risk? In other words, is the risk of a slip and fall on a hard kitchen floor with sort of hot stuff around enough of a risk itself that that would put on notice that a serious injury could result? And when we're looking at an arena where we're looking at negligence. That's why they had the rule, isn't it? Well, look at it. I mean, the reason they have the rule for no skip for the boots is because of the danger. The reason for the rules is a variety of reasons. Especially in a prison kitchen, of all places. The rules are a variety of reasons, which range from anywhere from uniformity of the prisoners to making sure that they are dressed for each occasion. The rules cover everything from field work in boots to the kitchen surface. Wearing Crocs in that kitchen would be reckless, wouldn't it? No, Your Honor. Wearing Crocs in the kitchen is not inherently reckless. Several inmates were wearing Crocs. The undisputed testimony is that inmates were wearing Crocs for five months before this incident. There were occasional slips. Nothing to this extent. And it's what divides us from negligence into the criminal recklessness arena. You're saying that they had to be aware not just of the slip and fall risk, but a slip and fall risk that would result in, what, a broken bone, a dislocation? Where's the point that they are aware of incidents that reach the Eighth Amendment level? That's exactly the point, Your Honor. It has to be, and there has to be prior incidents and not isolated that lead them to let them know that there will be a slip and fall that arises to a broken bone, to a dislocated hip. So what is it? What's the line? Like, is it, I mean, does a bone have to be showing out of your leg? I mean, where, at what point do they know that this is really bad and serious? In order for an Eighth Amendment violation as opposed to mere negligence, it would be that they have to recognize the seriousness of the injury, the dislocation, the broken bone, the sticking through the leg. What if we had testimony or what if we had evidence that every single day for the six months that boots were not available or at nine months that boots were not available, there were slip and fall incidents? In other words, people were slipping and sliding in that kitchen every single day with the Crocs that were worn by everybody. That would arise to a negligence level because it shows that there is a danger of slipping and falling. I don't think that level of, like, this is just going to happen and we're just, it's a ticking time bomb until somebody gets seriously hurt. You don't think that is not enough? It's not enough, Your Honor, and the case law supports that it's not enough. Which case says that if there were a thousand slip and fall incidents in the kitchen, that that does not put officers on notice for criminal recklessness such that it could result in serious harm to the person? The very latest one, Your Honor, the Wade v. McDade, requires a subjective knowledge of substantial injury, of serious injury. So it's not just that there's a possibility of a slip and fall, a risk of serious injury. Right, it's the risk. In other words, you don't have to know for a fact that would be purposeful or knowledge, but criminal recklessness is you have a really good idea that something bad is going to happen and you consciously disregard that thing. That's what criminal recklessness is. And it happened every day where people were slipping and sliding all over the kitchen on this stuff with hot food and all sorts of other dangerous items around. But luckily nothing happened. You're telling me that that does not create the kind of criminal recklessness that we defined in Wade? It doesn't, Your Honor, and that's because knowing for a fact is exactly what's required. It's a subjective standard where you have to have actual knowledge that an injury is going to take place. It doesn't have to be this specific injury, meaning a broken hip, but you have to know that a broken hip can occur, that a dislocation can occur. What we have in this situation is that there have been previous slip and falls, but the inmates or the people in the food service, the workers, have gotten right back up, gone back to work, taken ibuprofen, nothing that shows anything to this serious of a level. And that's what separates negligence from the Eighth Amendment violation, which is closer to punishment, punitive, or a criminal recklessness. So it's not enough that the person just slips and falls, but you have to know of the substantial danger of this serious injury that can occur. In other words, your application of the rule is something like this. They've got a rule that says you have to have the boots, and the reason you have to have the boots is some other kind of footwear is likely to be dangerous. That's why the boots are there, to eliminate danger. So under your theory, notwithstanding all that, the defendants have had to have actual notice that somebody else in a short period of time, these same defendants, knew that somebody had fallen, and more than just, they got to find out that somebody else had fallen and fractured a femur, or some such thing, or not. That's exactly it, Your Honor. They have to have some indication, some knowledge, that they have actual knowledge. There's a really dangerous injury from falling. That there is a really dangerous injury. Just falling is not enough, is that your position? That is my position, Your Honor. Okay. Falling is not enough. If they knew about falling, and people ultimately got up and went about, that's no Eighth Amendment or knowledge. There's no rights to an Eighth Amendment. Under Farmer. Under Farmer, and the line of cases that follows, and definitely under Wade. I understand your position. Thank you, Your Honor. Is it possibly negligent? Yes, definitely not a rise to the level of criminal negligence. Let's talk about the delay. Is there any inference that could be made that Officer Jelks, and I guess through Officer Jelks, Officer Cobb, did not actually call medical? There's no evidence that that happened. All the evidence points to that they did call medical. All the evidence- Is not a good inference that medical didn't come for five hours? We know that medical didn't come for a substantial time period. Can't you draw an inference from that, that medical wasn't contacted until around 10 o'clock in the morning? It is not a permissible inference. There's no indication, especially when you consider the fact that they had a reason why medical was- In other words, the inference is that maybe medical knew about it early on, and decided to bide their time until 10 o'clock? That could be the case, but that fault would then fall entirely upon medical. They were once in this case. So the proof in this case requires proof that medical didn't know until shortly before 10 o'clock. That would be needed, Your Honor, but there's nothing to indicate that medical didn't know before 10 o'clock. All the evidence shows that medical knew, were aware of this, and that the call was made to medical. But even assuming for argument that medical was not aware, we have to look at whether the guards themselves- Jenks said that she called medical. Yes, Your Honor. The undisputed fact is that Mr. Dombrowski said that medical was called. And she said that because the stimulus that was coming from Dombrowski was sufficient to prompt her to do that. I'm so sorry, Your Honor. Can you say that one more time? Why would she call medical at all? Based upon Mr. Dombrowski saying that he was injured. And even- Is there another way that you win on this issue? In other words, let's assume Jelks didn't call medical. As I understand the undisputed evidence, again, or not the undisputed, but the evidence viewed in light most favorable to the opposing, to the plaintiff here, Jelks essentially said, I don't believe you. I think you're faking this. I think you're mad that you didn't get the boots you wanted, and you're faking your injury. And I just don't think you're as seriously injured as you're saying you are. Is that not the evidence viewed in the light most favorable to the plaintiff? That is the evidence, Your Honor. And that shows that the guards, Jelks and Cobbs, did not have a subjective knowledge of the risk of serious harm. Right. And so, assuming, and then Judge Newsom asked about this earlier, but that Jelks and Cobb weren't aware about the crying that happened later, sort of when the plaintiff was moved to, I guess, like the cafeteria room and laid on the table. They weren't aware of that. There's no evidence that they were. But it seems to me that the evidence is simply subjectively they didn't know that this was serious. And especially since they had the report from the plaintiff himself who said, I don't think this is that serious. I could pop it back in. I may be able to pop it back in. Isn't it your position that it doesn't matter at all whether or not Jelks called medical? Because neither Jelks nor Cobbs had advanced notice of somebody going, sliding, coming down on the floor and being injured. Not just falling down, but falling down and suffering an injury. Without that knowledge, they can't be held liable. So it wouldn't matter whether they called, would it? That's correct, Your Honor. It would not matter because they did not know the seriousness of Mr. Dombrowski's injury. He describes them as seeming skeptical that they didn't believe him. He tells them that he can pop his hip back in, see if he can get back to work. And let's not forget one of the most important factors is that it actually takes a trained EMT whose outside comes in and recognizes the injury. And because he's outside the facility, he's able to go and see where medical is. But it took a trained EMT to recognize the injury. I believe Mr. Dombrowski even says at one point that when he's being carted off by the medical team, when they get there, they tell him, you better not be faking. Further just highlighting just how difficult it would have been for an untrained medical person, even the medical people involved didn't recognize the seriousness of this injury. And for Cobbs and Jelks, they certainly would not have been able to, did not recognize the seriousness of the injury. And just kind of sticking with that, Your Honor, because they didn't recognize the seriousness of the injury, it really, it's not important whether they called medical or not, but the undisputed facts show that they did in fact call medical, had a reason that medical was not there. Due to the COVID-19 checks, medical did ultimately come and take Mr. Dombrowski to where he needed to go next. So if they responded reasonably to the risk, which is the calling of medical, it shows that it cannot be an Eighth Amendment violation. What is the design capacity for this institution? I don't know. You know, they all have design capacities, and of course, most of them are overflowing. They're designed for 500 beds. And the reason for 500 beds is that you can see the inmates all the time. So I don't know. If you've got 1,400 inmates in there, I want to know, does the record tell us what it's designed for? Because that's a fact. So the record does not tell us the design of Hamilton Correctional Institution. Or how overcrowded it might have been. The record doesn't give us that information. How many did they feed at each meal? That's an important question. That is an important factor. Because it's COVID, the inmates aren't coming into the food service area. What we have is the inmates that are assigned to the food service, they come in to prepare the meal, and then the meals are delivered to the inmates in their cell. They're at this time still trying to do social distancing. Separation between the kitchen and the dining hall. It's separated by a small wall, Your Honor. Well, by a full wall, but a wall separates the two areas. I believe you can travel from the kitchen to the dining area, back and forth. But there are no inmates in the, other than the ones in the food service preparing the food, which is the limited staff, there are no inmates in the dining area. Well, the only people in the dining area then were Jelks and Cobb. And Delmaski himself. And the food service workers. And how many were those? The record doesn't indicate how many were there. How many normally would be there? Do we know that? That I do not know, Your Honor. How many people are they feeding in the dining hall at that time? I believe it said over 1,400 inmates at the institution. Well, then they've got to have some people in the kitchen besides the Jelks and Cobb. And we know that there were other inmates in the kitchen, just not a specific number. Working in the kitchen? Working in the kitchen, yes. Just not a specific number. And Your Honor, I'm at the end of my time, but I do believe that we should affirm the lower court's decision, both as to the delays caused by the medical staff, there's no evidence of subjective knowledge of risk of serious harm. The evidence shows that the officers did not disregard that risk, and there certainly does not, we do not have a level that arises to subjective recklessness as used in criminal law. The exact same, Your Honor, for the slip and fall portion of this, we know that no boots were available, no evidence that the defendants were aware that not having boots would put plaintiff at a substantial risk of serious harm for liability under the Eighth Amendment. The evidence of prior similar injuries, there is none, and the previous falls indicate that there were no substantial injuries, so they would not have had notice. Thank you, Your Honor. Very well, thank you. Mr. Cook, you've got three minutes. Thank you, Your Honor. Thank you. May it please the court, there was no discretion for Jelks and Cobb to deny, or Wilson to deny boots to Mr. Dombrowski. You mean under the policy, or under the Eighth Amendment? Under the policy. So how do you connect that, I mean, as Judge Luck said, the violation of the policy may be unfortunate, but why is that if so fact a violation of the Eighth Amendment? Well, because the policy, the violation of the policy was also the violation that showed deliberate indifference. They had no argument and showed no evidence that they had the right not to provide him with the boots. That would only be the case if they knew the consequence of it. In other words, if you're right, that would mean that any violation of policy would be an Eighth Amendment violation, and we know for a fact that that's not true. We have case law that says exactly the opposite of that. And so the connection there has to be that they knew that the policy was there because of the consequence that could happen. And you'd have to show that by knowing that, not just by inference, but by, it could be prior incident, it could be their own admission. I knew that this policy was there because without it, someone is going to slip and fall and crack their head open. But tell me the best piece of evidence you have to draw that connection. Well, the factual issues in the case, the fact that the exact thing that the rule was meant to prevent. I'm just not sure that's true. And I gave you the example before, and the example isn't just me speculating. It's actually based on your client's deposition testimony, where he says, I have holes in my shoes, and without it, the bubbling over would cause burns. And that makes sense to me. But that is definitely a reason not slip and fall related for the policy.  The threat of serious injury is typical in an environment with a hard, slick floor. A person doesn't fall in a wet floor kitchen environment the way they might on a carpet. They don't necessarily crumple. Basically, their legs shoot out from under them, and they land on a hard part of their body. So the risk of injury was very great. The fact that other people weren't, that we don't know that other people were injured in the same way, that doesn't mean that they weren't. That wasn't the issue.